UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VICKI SUE GOCHENOUR, as Executrix of the
Estate of GUY GOCHENOUR, deceased, and
VICKI SUE GOCHENOUR, individually,

                      Plaintiffs,

               -against-

UNITED STATES OF AMERICA,

                     Defendant.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **03/08/2024**

20 Civ. 4607 (NSR)

OPINION & ORDER

**NELSON S. ROMÁN, United States District Judge:**

    Plaintiffs Vicki Sue Gochenour, individually, and Vicki Sue Gochenour, as Executrix of the Estate of Guy Gochenour (referred to singularly as "Plaintiff" throughout this opinion), commenced this action by complaint filed June 16, 2020 (ECF No. 1) against Defendant United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680. The complaint alleges that healthcare practitioners at Middletown Community Health Center ("MCHC"), a federally funded medical provider, committed medical malpractice by failing to properly treat and care for Guy Gochenour's ("Decedent") hepatocellular carcinoma ("HCC"), a type of liver cancer, resulting in his death.

    Presently before the Court are Plaintiff's motion for partial summary judgment (ECF No. 59) and Defendant's cross-motion for partial summary judgment (ECF No. 53) pursuant to Federal Rule of Civil Procedure 56, seeking judgment as a matter of law of certain facts the parties contend are not in dispute. For the reasons below, the Court denies Plaintiff's motion and grants Defendant's motion.

## BACKGROUND

### I.   Factual Background

The following facts are derived from the record and the parties' Rule 56.1 statements. They are not in dispute unless otherwise noted.[1]

#### a.   Decedent's Visits to MCHC

Middletown Community Health Center ("MCHC") is a federally funded medical provider. (Pls. 56.1 ¶ 3.) Guy Gochenour ("Decedent") received treatment at MCHC between March 2014 and December 2017. (Pls. 56.1 ¶ 2 (citing Pls. Ex. C *passim*).) On December 11, 2014, Decedent met with Dr. Linda Mendelsohn for the first time, "complaining of hands being sensitive to the cold and turning white then black." (Pls. Mem. at 2; Def. Mem. at 3.)  Dr. Mendelsohn ordered lab tests, including liver function tests ("LFTs"), the results of which became available on December 15, 2014. (Pls. Mem. at 2-3; Def. Mem. at 3.) On December 15, 2014, Dr. Mendelsohn called Decedent with those results—which indicated that Decedent had an elevated AST of 50 (reference range 0 – 40)—and she advised him to lower his alcohol consumption and to repeat his LFTs in three months. (*Id.*) Decedent did not return to MCHC until March 26, 2016, where he saw Nurse

---

[1] Citations to "Pls. Ex." refer to the Exhibits attached to the Declaration of Keith J. Clarke in Support of Plaintiffs' Motion for Partial Summary Judgment. (ECF No. 62.) Citations to "Def. Ex." refer to the Exhibits attached to the Declaration of Jennifer Jude in Support of Defendant's Cross-Motion for Partial Summary Judgment. (ECF No. 56.)

Citations to the Expert Report of Nurse Practitioner Justin Waryold ("Waryold Exprt. Rpt.") refer to Def. Ex. C. Citations to the Expert Report of Dr. Paul Bader (Bader Exprt. Rpt.") refer to Def. Ex. D and Pls. Ex. E. Citations to the Expert Report of Dr. Mark Schattner ("Schattner Exprt. Rpt.") refer to Exhibit A to the Declaration of Dr. Mark Schattner ("Schattner Aff.," ECF No. 57). Citations to the Affidavit of Paul Bader ("Bader Aff.") refer to Pls. Ex. D.

Citations to the Deposition of Joyce Hill ("Hill Tr.") refer to Def. Ex. B and Pls. Ex. H. Citations to the Deposition of Dr. Bader ("Bader Tr.") refer to Def. Ex. F. and Pls. Ex. E. Citations to the Deposition of Dr. Schattner ("Schattner Tr.") refer to Def. Ex. G and Pls. Ex. G.

Where applicable, the Court refers to page numbers using the Bates numbers applied by the parties.

Allyson Favuzza and complained about a two-week history of night sweats that began shortly after he recovered from upper respiratory symptoms. (Pls. Ex. C at 24.)

On August 10, 2017, Decedent returned to MCHC with the chief complaint of "constant back pain." (Pls. 56.1 ¶ 4.) During that visit, he was examined by Nurse Practitioner Joyce Hill ("Nurse Hill") who ordered lab tests, including LFTs. (*Id.* ¶ 5; Pls. Mem. at 3; Def. Mem. at 4.) The laboratory results "showed concerning elevated levels of AST, ALT, and alkaline phosphatase," which Nurse Hill testified during her deposition indicated Decedent's "liver had something going on with it." (Pls. 56.1 ¶¶ 7-8.) On September 26, 2017, Decedent returned again to MCHC complaining of swollen ankles. (Pls. Ex. C at 20.) Nurse Hill again ordered lab tests, which again returned abnormal results, and advised Plaintiff to follow-up in a week, or visit the emergency room if symptoms worsen. (*Id.* at 20, 31-33.) On October 4, 2017, Decedent returned to MCHC and was seen by Nurse Hill as a follow-up to his appointment with his cardiologist, who advised him to have surgery for aortic stenosis. (*Id.* at 19.)

> b. *Decedent's Liver Cancer Diagnosis, Post-Diagnosis Treatment, and Death*

On December 18, 2017, in preparation for heart surgery Decedent underwent a CT scan of his abdomen which revealed a 16 cm mass on his liver. (Pls. Ex. C at 57; Schattner Expt. Rpt. at 3.) On December 22, 2017, Decedent returned to MCHC for additional lab tests and Nurse Hill ordered a STAT MRI of Decedent's abdomen. (Pls. Mem at 5; Def. Mem. at 5.) On December 28, 2017, the STAT MRI was performed, and confirmed the large liver mass. (Pls. Ex. C at 70; Schattner Expt. Rpt. at 3.) In August 2018, Decedent underwent Y90 radioembolization and began taking pembrolizumab. (Pls. Mem. at 6; Def. Mem. at 5.) On October 25, 2018, Decedent died from HCC, a form of liver cancer. (Pls. 56.1 ¶ 1.) A couple years thereafter, Decedent's wife, Vicki

Sue Gochenour ("Plaintiff") commenced this action individually and as executrix of Decedent's estate.

### c. Nurse Hill's Documentation in the Medical Chart

Nurse Hill testified that the applicable standard of care would have required that she tell Decedent to follow up with a gastroenterologist because of the abnormal lab results. (Pls. 56.1 ¶ 9.) Whether Nurse Hill actually did so is disputed. Nurse Hill testified that she told Decedent he needed to follow up with a gastroenterologist about the abnormal test results and that those tests suggested possible liver problems. (Hill Tr. 170:11-171:7, 221:6-12, 230:2-8.) However, Nurse Hill did not document this conversation in Decedent's medical chart. (Pls. Ex. C. at 21-23.) Moreover, Nurse Hill's notes for Decedent's August 10 visit also do not include a diagnosis for liver disease or liver cancer. (Pls. 56.1 ¶ 12.) That said, Nurse Hill's notes on December 21, 2017 indicate a request for referral to gastroenterology and hematology. (Pl. Ex. C at 19.)

### d. The Parties' Experts

In support of their motions, the parties submit the expert reports and affidavits of three experts: Dr. Mark Schattner, Nurse Practitioner Justin Waryold, and Dr. Paul Bader.

Dr. Paul Bader, Plaintiff's expert, is a physician specializing in oncology and hematology. (Bader Aff. ¶ 1.) He opines that "had Mr. Gochenour received a further work-up in the form of further diagnostic testing, in December 2014, March 2016, and August 2017, it would have substantially increased his chance of survival." (Bader Expt. Rpt. at 12.) He further opines that a diagnosis in August 2017 "would have allowed for earlier palliative care even if there was no opportunity for cure." (*Id.* at 18.)

Nurse Waryold, Plaintiff's expert, is a certified ANP-C and adult nurse practitioner. He opines that Nurse Hill departed from the accepted standards of care in (1) failing to notify

Decedent or Plaintiff of the abnormal laboratory studies; (2) failing to refer Decedent to a specialist for further diagnostic studies upon learning of the abnormal lab results; (3) and failing to include liver cancer within a differential diagnosis based on the abnormal lab results and rule out liver cancer as an explanation. (Waryold Expt. Rpt. at 6-9.)

Dr. Mark Schattner, the Government's expert, is the Chief of the Gastroenterology, Hepatology and Nutrition Service at Memorial Sloan Kettering Cancer Center and a Professor of Clinical Medicine at Weill Cornell College of Medicine. (Schattner Aff. ¶ 1.) He opines that "the 4-month delay in diagnosis was unlikely to have substantially decreased [Decedent's] chance for survival or life expectancy." (Schattner Expt. Rpt. at 5-6.) During his deposition, Dr. Schattner testified as to whether Nurse Hill departed from the applicable standard of care. This testimony is discussed in further detail below. (*See infra* at 13-16.)

## II.    Procedural Background

Plaintiff filed this action on June 16, 2020 alleging claims for personal injuries, lack of informed consent, Plaintiff's loss of consortium, services, love, and affection of her husband, and wrongful death.  ("Compl." ECF No. 1.) The parties completed discovery in September 2021, and thereafter entered settlement negotiations. (Minute Entry dated 09/15/2021.) The parties were unable to reach a resolution and sought leave to file cross-motions for partial summary judgment. (ECF No. 42.)

Plaintiff filed a motion for partial summary judgment only as to the first cause of action of the Complaint—that MCHC's negligence in their care and treatment of Decedent in August 2017 deprived him of a chance to receive earlier palliative care thereby causing him increased pain and suffering. Defendant filed a cross-motion for partial summary judgment on the issue of causation regarding the care provided in 2017. Both motions were fully briefed as of March 30, 2023:

Plaintiffs' Motion for Partial Summary Judgment (ECF No. 59); Plaintiffs' Memorandum of Law in Support ("Pls. Mem.," ECF No. 60); Plaintiffs' Rule 56.1 Statement of Material Undisputed Facts and Response to Defendant's Statement of Undisputed Material Facts ("Pls. 56.1," ECF No. 61); Plaintiffs' Reply Memorandum ("Pls. Reply") (ECF No. 63); Defendant's Cross-Motion for Partial Summary Judgment (ECF No. 53); Defendant's Memorandum of Law in Support ("Def. Mem.," ECF No. 54); Defendant's Rule 56.1 Statement of Material Undisputed Facts and Response to Plaintiffs' Statement of Undisputed Material Facts ("Def. 56.1," ECF No. 55); and Defendant's Reply Memorandum ("Def. Reply," ECF No. 58).

## LEGAL STANDARDS

### I.   Federal Rule of Civil Procedure 56

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (holding the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (internal quotations and citations omitted)).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must "draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [ ] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009) (citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## II.   Medical Malpractice Claims

As the parties do not dispute, New York substantive law applies to Plaintiff's medical malpractice claims. *Guttridge v. United States*, 927 F.2d 730, 731–32 (2d Cir. 1991) (citing 28

U.S.C. § 1346(b)). To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries. *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994) (citing New York state cases). "Except as to matters within the ordinary experience of knowledge of laymen, expert medical opinion evidence is required to make out both of these elements." *Milano by Milano v. Freed*, 64 F.3d 91, 95 (2d Cir. 1995) (citing New York state cases) (cleaned up).

To suffice, the expert's opinion "must demonstrate 'the requisite nexus between the malpractice allegedly committed' and the harm suffered." *Park v. Kovachevich*, 116 A.D.3d 182, 191, 982 N.Y.S.2d 75 (2014) (citing *Dallas-Stephenson v Waisman*, 39 AD3d 303, 307 (1st Dept 2007)) (citation and internal quotation marks omitted). While the opinion of a qualified expert that a plaintiff's injuries were caused by a deviation from the relevant industry standards generally precludes a grant of summary judgment, "where the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation the opinion should be given no probative force and is insufficient to withstand summary judgment." *Id.* at 192 (citing *Diaz v New York Downtown Hosp.*, 99 NY2d 542, 544 (2002)) (cleaned up).

To establish proximate cause, a plaintiff need only show evidence sufficient for a reasonable person to conclude that it was "more probable than not that the defendant's deviation was a substantial factor in causing the injury." *Goldberg v. Horowitz*, 73 A.D.3d 691, 694, 901 N.Y.S.2d 95 (2010) (collecting cases). "A plaintiff's evidence of proximate cause may be found legally sufficient even if his or her expert is unable to quantify the extent to which the defendant's act or omission decreased the plaintiff's chance of a better outcome or increased the injury, "as long as evidence is presented from which the jury may infer that the defendant's conduct

diminished the plaintiff's chance of a better outcome or increased the injury." (*Id.*) (internal quotation marks and citations omitted).

## DISCUSSION

### I.   Plaintiff's Motion for Partial Summary Judgment

Plaintiff seeks partial summary judgment against Defendant on two issues: (1) that MCHC departed from the applicable standard of care in treating and caring for Decedent in 2017 and (2) that MCHC's departure from the applicable standard of care deprived Decedent of earlier palliative and therefore caused him increased pain and suffering. The Court addresses each issue in turn.

#### a.   *Whether MCHC departed from the applicable standard of care in treating and caring for Decedent in 2017*

Before his liver cancer diagnosis in December 2018, Decedent presented at the MCHC complaining of "constant back pain" in August 2017, and lab results from that visit "showed concerning levels of AST, ALT, and alkaline phosphatase" and "indicated [Decedent's] liver [. . .] ha[d] something going on with it." (Pl. Mem. at 8.) Plaintiff argues that there is no factual dispute that Nurse Hill deviated from the applicable standard of care by failing to properly follow-up with Decedent regarding the abnormal lab results. (*Id.*) Plaintiff argues: (1) there is no evidence Nurse Hill brought the concerning lab results to Decedent's and Plaintiffs' attention; (2) there is no evidence Nurse Hill "formulate[d] in her notes a differential diagnosis that included liver disease or cancer—despite her documented awareness 'something' was 'going on' with [Decedent's] liver"; and (3) there is no evidence Nurse Hill referred Decedent to a gastrointestinal specialist upon her review of the abnormal lab results in August 2017, instead of failing to do so until December 2017. (*Id.*) Plaintiff further contends Defendant's expert Dr. Schattner "unequivocally" agrees that MCHC departed from the applicable standard of care in August 2017. (*Id.*) Specifically, according to Plaintiff, Dr. Schattner concluded that Nurse Hill departed from the applicable

9

standard of care in (1) her failure to document in the MCHC chart that she informed Decedent or Plaintiff of Decedent's abnormal lab results and (2) her follow-up regarding Decedent's abnormal liver tests. (*Id.* at 9.)

Defendant counters that evidence exists on each of the three points Plaintiff identifies. First, Nurse Hill testified that she had notified Decedent and Plaintiff of the abnormal lab results, informed them of potentially serious issues with his liver, and advised Decedent he needed to follow-up with a gastroenterologist for further evaluation. (Def. Mem. at 13-14.) Moreover, Defendant argues that the experts disagree whether Nurse Hill deviated from the applicable standard of care as their conclusions are contingent on determining whether Nurse Hill made a timely referral to a liver specialist. (*Id.* at 15.)

Upon a close review of the record, the Court is persuaded that summary judgment is inappropriate. Taking the evidence in a light most favorable to Defendant, the Court concludes that there are disputes of fact most appropriate for the jury to resolve. More specifically, given Nurse Hill's testimony (despite Plaintiff's challenge to her credibility) and Dr. Schattner's affidavit (despite him needing to clarify his testimony), Defendant has raised issues of material fact sufficient to defeat Plaintiff's motion for partial summary judgment.

Nurse Hill testified at her deposition that she notified Decedent of the abnormal lab results, explained the significance of the lab results, including that "he could have a kidney issue or a cardiac issue," and advised him to follow up with cardiology and a gastroenterologist (Hill Tr. 170:11-171:7, 221:6-12, 230:2-8.) Plaintiff does not necessarily dispute that Nurse Hill testified to these facts, but instead characterizes Nurse Hill's testimony as "self-justifying." (Pls. Reply at 5-7.) However, it is most appropriate for the jury to weigh the credibility of Nurse Hill's testimony upon viewing it in the broader context of all the evidence on the record. *Warren v. City of New*

*York Dep't of Corr. Med. Staff*, No. 17CV1125PKCLB, 2021 WL 1163105, at *7 (E.D.N.Y. Mar. 26, 2021) ("The Court does not weigh evidence or assess the credibility of witnesses, which are matters for the jury.") (citations omitted). And this is particularly true where, as here, there is no evidence in the record that Nurse Hill "fundamentally contradicted [herself] on numerous occasions." *Id.* at *10; *c.f. Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (credibility determination appropriate on summary judgment "where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete."). Creating a genuine issue of material fact, Nurse Hill's testimony directly contradicts Plaintiff's assertion that she did not notify Decedent and Plaintiff of Decedent's abnormal lab results or did not refer Decedent to a specialist. It is for the jurors themselves to determine whether Nurse Hill's testimony is "self-serving."

The Court also finds Plaintiff's assertion that the "experts agree" unavailing. Plaintiff's expert Nurse Waryold opines that Nurse Hill departed from the accepted standards of care in (1) failing to notify Decedent or Plaintiff of the abnormal laboratory studies (Waryold Expt. Rpt. at 6); (2) failing to refer Decedent to a specialist for further diagnostic studies upon learning of the abnormal lab results (*id.* at 8); and (3) failing to include liver cancer within a differential diagnosis based on the abnormal lab results and rule out liver cancer as an explanation (*id.* at 9). While Nurse Waryold based his conclusions on his experience, expertise, and training, he also weighs the credibility of Nurse Hill by describing her testimony as "ambiguous or inconsistent" and "unreliable." (*Id.* at 6-8.) The Second Circuit routinely excludes expert opinion on the credibility of a witness that "does not assist the trier of fact, but rather undertakes to tell the jury what result to reach, and attempts to substitute the expert's judgment for the jury's." *United States Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, 552 F. Supp. 3d 427, 432 (S.D.N.Y. 2021) (internal

11

citations omitted) (collecting cases). Nurse Waryold's opinion on the applicable standard of care required of Nurse Hill in the care and treatment of Decedent is appropriate. However, the Court precludes Nurse Waryold from supplanting the role of the jury and passing judgment on the credibility of Nurse Hill. The Court thus declines to determine as a matter of law that Nurse Hill failed to inform Decedent and Plaintiff of the abnormal lab results or refer Decedent to a specialist.

Plaintiff further argues Dr. Schattner's expert opinion and testimony "unequivocally" concludes that Nurse Hill departed from the standard of care. At the outset, the parties agree Dr. Schattner testified that Nurse Hill's *failure to document* that she informed Decedent and Plaintiff about the abnormal lab results deviated from the standard of care. (Pls.' 56.1 ¶ 13; Def.'s 56.1 Response ¶ 13.) At his deposition, Dr. Schattner testified "the followup for those abnormal liver tests [in the late 2017 visits] I think was outside the standard of care. At least what was in the medical record." (Schattner Tr. 58:25-59:6.)

The parties dispute, however, whether Dr. Schattner also testified that Nurse Hill departed from the applicable standard of care in her follow-up of the August 2017 visit. Dr. Schattner identifies part of the departure of the applicable standards of care as Nurse Hill's failure to make the appropriate documentations in the medical record, but he also testifies that her follow-up was inappropriate. (Schattner Tr. 104:23-105:5.) Dr. Schattner explicitly states "[h]er care was not appropriate in 2017." (Schattner Tr. 106:11-12.) However, in his expert report, Dr. Schattner clarifies his testimony. In his affidavit, Dr. Schattner opines that whether Nurse Hill departed from the standard of care depends on whether she referred Decedent to a gastroenterologist. (Schattner Aff. ¶ 5.) In addressing his testimony, he claims that he was answering with the assumption that she had not in fact made a referral. He explicitly states that "if Nurse Hill did refer Decedent to a specialist to follow-up on his abnormal test results in a timely manner, that would comply with the

standard of care." (*Id.*) As his sworn testimony and his affidavit clarifying said testimony are not contradictory, Dr. Schattner proffers evidence contradicting Plaintiff's assertion that Nurse Hill deviated from the applicable standards of care. *Bright v. Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6 (2d Cir. 2015) ("[A] subsequent affidavit may reveal a material issue of fact if the affidavit amplifies or explains, but does not merely contradict, the prior testimony.") (citing *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996)). Therefore, there exists a genuine issue of fact sufficient to defeat Plaintiff's summary judgment motion on this issue.[2]

Per the Court's understanding, the parties do not dispute that had Nurse Hill failed to refer Decedent to a gastroenterologist or notify Decedent or Plaintiff about the abnormal lab results, then such failures would constitute a departure from the appliable standard of care. Based on the expert reports and testimony in the record, the Court holds that it is best left for the jury to weigh the evidence on the record to determine whether Nurse Hill actually committed such failures. Accordingly, the Court denies Plaintiff's motion for partial summary judgment on this issue.

      *b.   Whether MCHC's departure from the standard of care deprived Decedent of earlier palliative care and therefore caused him increased pain and suffering*

Plaintiff argues it is undisputed that had Decedent been timely diagnosed he would have had a better chance of survival, and even if not, he would have received earlier palliative care. (Pls. Mem. at 9.) Plaintiff further argues it is undisputed that, had Decedent received this earlier palliative care, he would have experienced an improved quality of life prior to his death. (*Id.* at 9-10.) Plaintiff contends that both its expert Dr. Bader and the Government's expert Dr. Schattner

---

[2] The Court also notes that Plaintiff does not address Dr. Schattner's affidavit in her Reply. Instead, she merely argues that Defendant's arguments regarding Dr. Schattner's opinion about Nurse Hill's care is "implausibl[e]," and puts forth a different interpretation of the Dr. Schattner's testimony. (Pls. Reply at 6.)

agree with this conclusion. Defendant counters that Plaintiff has misinterpreted Dr. Schattner's testimony, and that a factual dispute exists as to the availability and effect of earlier palliative care. (Def. Reply at 12-13.) Accordingly, the Court's determination again comes down to whether the experts actually agree.

In a medical malpractice case, proximate cause requires proof that the defendant's deviation from the standard of care was a substantial factor in bringing about the injury. *Gonzalez v. United States*, 612 F. Supp. 3d 336, 346 (S.D.N.Y. 2020), *aff'd*, 80 F.4th 183 (2d Cir. 2023), and *aff'd*, 80 F.4th 183 (2d Cir. 2023) (citing *D.Y. v. Catskill Reg'l Med. Ctr.*, 156 A.D.3d 1003, 66 N.Y.S.3d 368, 371 (3d Dep't 2017)). "Where, as here, the plaintiff alleges that the defendant negligently delayed in diagnosing and treating a condition, proximate cause may be predicated on the theory that the defendant diminished the patient's chance of a better outcome or increased the injury." *D.Y.*, N.Y.S.3d at 371. While an expert need not quantify the extent to which the delayed diagnosis reduced the chance of a better outcome or increased the injury, plaintiff must present evidence sufficient for the jury to infer that defendant reduced the chance of a better outcome or increased the injury. *Gonzalez*, 612 F.Supp.3d at 346 (citing *D.Y.*, N.Y.S.3d at 371).

The parties do not dispute that Dr. Bader concluded that an August 2017 diagnosis "would have allowed for earlier palliative care even if there's no opportunity for cure." (Bader Tr. 120:23-122:16.) Dr. Bader clarifies his point in his affidavit: "it is [his] opinion, to a reasonable degree of medical certainty, that the fact that [Decedent] was in less pain post-diagnosis, thanks to the palliative treatments he received, proves that [Decedent] would have been in less pain *earlier*, and would have enjoyed a better quality of life longer, but for MCHC's negligent failure to diagnose [Decedent's] cancer in August 2017 and the resultant delay in his starting palliative treatments." (Bader Aff. ¶ 10 (emphasis in original).)

14

That said, the parties have differing interpretations of Dr. Schattner's testimony. On the one hand, Defendant interprets his testimony as stating that it is merely possible that earlier palliative treatments could have improved Decedent's quality of life, but "it was impossible to determine whether earlier palliative treatments would have actually made any difference." (Def. Reply at 12-13.) In contrast, Plaintiff interprets Dr. Schattner as "unequivocally" testifying that earlier palliative care would have improved Decedent's quality of life, and "as a conscientious clinician," stated that he could not say the extent to which Decedent's quality of life would have been improved. (Pls. Reply at 3-4.) The determination of the extent of that improvement, Plaintiff argues, should be left to the jury. (*Id.* at 4.)

Upon close review, the Court agrees with Defendant's interpretation, and finds that there is a genuine dispute of material fact. Based on the Court's review of his testimony, Dr. Schattner opines the following: (1) Decedent did not experience an improved quality of life from the treatments, as he did not respond significantly well or meaningfully to them (Schattner Tr. 108:3-11; 107:3-107:19); (2) if MCHC and Nurse Hill had not deviated from the applicable standards of care, Decedent would have been diagnosed earlier (*id.* at 109:17-23); (3) if Decedent had been diagnosed earlier, he would have received palliative treatments earlier (*id.* at 109:24-110:3); and (4) if Decedent had received the treatments earlier, Decedent's quality of life could have *possibly* been improved for a short period of time (*id.* at 109:5-11 (emphasis added)). None of these statements are an "unequivocal" assertion that an earlier diagnosis would have led to Decedent receiving earlier palliative care that would have provided Decedent an improved quality of life. Plaintiff misconstrues Decedent's testimony in the passage she quotes.[3] Dr. Schattner certainly

---

[3] The Court believes Plaintiff misconstrues the passage wherein it appears that Dr. Schattner is agreeing with the examiner's assertion. During the exchange, rather than asserting that "[i]t would have improved [Decedent's] quality of life from the difference in the start time," Dr. Schattner seeks to clarify

agrees that had Decedent received a diagnosis earlier, he would have received palliative care earlier, and thus any benefit of that palliative care earlier as well. However, Dr. Schattner clearly testifies that any benefit to Decedent would be based on speculation—the benefit of the treatments is based on a comparison to the theoretical that he did not receive any treatments at all and, based on his review of the medical records, Decedent did not receive "much benefit" from the palliative care that he received after the untimely diagnosis. (Schattner Tr. 110:24-111:18.) Dr. Schattner explicitly states "*if* he got a benefit, he would have gotten that benefit earlier" and earlier palliative care would have "*possibly* improved his quality of life." (*Id.* at 110:19-111:5.)

Dr. Schattner's testimony cannot be construed as agreeing that earlier palliative care would have improved Decedent's quality of life or reduced Decedent's pain and suffering. While there is no dispute that Decedent would have received earlier palliative care if he had received an earlier diagnosis, there is a genuine dispute as to whether such earlier care would have led to an improved quality of life for Decedent. Accordingly, Plaintiff is not entitled to summary judgment on this issue.

## II. Defendant's Motion for Partial Summary Judgment

Defendant argues summary judgment on the issue of causation with respect to the care provided to Decedent in August 2017 is appropriate because there is no dispute that MCHC's alleged departures from the applicable standard of care did not cause Decedent to lose a "substantial" chance of survival. (Def. Mem. at 8.) According to Defendant, the experts agree that

---

the question. (Schattner Tr. 110:8-10.) In response to the examiner's question "And if the palliative treatment was started earlier it would have increased his quality of life for that much longer," Dr. Schattner seeks to clarify the examiner's meaning of "that much longer," and asks if he meant "from the difference in the start time." (*Id.* at 110:4-10.) This is supported by the examiner then affirming by saying correct, and rephrasing the question to "[i]f it was diagnosed when it should have been diagnosed he would have had the benefits of that treatment for however many more months?" (*Id.* at 110:11-16.)

even if Decedent had been timely diagnosed, it would not have substantially changed his life expectancy because the approximately four-month delay in diagnosis only reduced his chances of five-year survival from between 5% to 10% down to between 0% to 5%. (*Id.* at 10-11.) Defendant contends that this loss of 5% to 10% chance of survival does not constitute a substantial loss to prove causation under New York law. (*Id.* at 11.)

Plaintiff counters that "the cited percentages do not accurately reflect the nuances of Dr. Bader's analysis of the 'loss of chance' issue" and within the broader context of his opinion, prove a substantial loss. (Pl. Reply at 9.) Plaintiff reasons that Dr. Bader's opinion is therefore sufficient to establish proximate cause. (*Id.*) Furthermore, Plaintiff contends that Defendant "misuses" Dr. Bader's percentages—if Decedent had his 10% chance of survival "reduced to as low as possibly 0% four months later; he suffered a 100% loss of his 10% chance." (*Id.* at 10.) In Plaintiff's view, Defendant's negligence caused Decedent to lose his entire chance of surviving five years or positively responding to treatment. (*Id.*) In response, Defendant argues that Dr. Bader's statements regarding the *possibility* of prolonged survival and positive response to treatment are too speculative to prove causation. (Def. Reply at 4.) Upon due consideration, the Court concludes that as a matter of law MCHC's failure to diagnose Decedent in August 2017 did not cause a "substantial" loss of the chance of a better outcome.

Under the loss-of-chance doctrine, a plaintiff may "recover damages for the reduction in the odds of recovery attributable to a defendant, even when that reduction is less than fifty percent." *Mann v. United States*, 300 F. Supp. 3d 411, 422 (N.D.N.Y. 2018). Although recovery is available if the loss of chance is less than fifty percent, New York courts typically award recovery based on loss of chance "when plaintiffs are deprived of a substantial possibility of recovery." *Id.* at 422 n.3 (N.D.N.Y. 2018) (citing New York state cases); *Clune v. Moore*, 142 A.D.3d 1330, 1331-32 38

17

N.Y.S.3d 852 (2016) ("[T]he plaintiff must present evidence from which a rational jury could infer that there was a 'substantial possibility' that the patient was denied a chance of the better outcome.").

Both Dr. Bader and Dr. Schattner describe Decedent as suffering from a progressive disease wherein the symptoms of the disease worsen over time. (Bader Expt. Rpt. at 5 ("Timing is cruicial when dealing with such a time-sensitive condition as [HCC]."); Bader Tr. 85:3-10 ("[T]he time sensitivity rests on the fact that there is a window of opportunity when the disease is curable and a subsequent interval when it is not."); Schattner Tr. 102:17-18 (answering yes to the question of whether there is a relationship between the progression of liver disease and the severity of symptoms).) Reviewing the expert reports and testimony of Plaintiff's expert Dr. Bader and Defendant's expert Dr. Schattner, the dispute between the parties' experts thus is not whether the four-month delay in diagnosing Decedent decreased his chances of survival, but rather whether that decrease was "substantial."

Dr. Bader opines that "there existed a chance of a better outcome . . . substantially better than whatever chance [Decedent] was left with without a timely diagnosis." (Bader Expt. Rpt. at 7.) Specifically, Dr. Bader testified that had Decedent's liver cancer been diagnosed in December 2015 or March 2016, he would have had a "significant five-year disease-free survival," but by August 2017, the five-year survival rate dropped to less than 10 percent. (Bader Tr. 15:17-15:24; 16:25-17:8.) Dr. Bader's opinion relies on the fact that an earlier-in-time diagnosis itself increases chances of survival, stating "[i]t is more likely than not that such an early diagnosis and the treatment of opportunities it would have presented . . . would have substantially increased [Decedent's] chance of survival." (*Id.*) In contrast, Dr. Schattner opines that "a 4-month delay in diagnosis was unlikely to have substantially decreased [Decedent's] chance for survival or life

expectancy," relying on the following factors: the size of Decedent's tumor in August 2017 based on its size in December 2017; Decedent's liver failing to respond to treatment, which suggested severe liver disease; and the sole cure for his HCC and liver disease likely being a liver transplant and, given his tumor size, it was "inconceivable" that he would be eligible as a candidate for one. (Schattner Expt. Rpt. at 5-6.) The Court determines, in accordance with the prevailing caselaw, that a jury could not reasonably conclude that Decedent loss a substantial chance of survival.

First, Dr. Bader himself states that "substantial," as he uses the terms, means "any statistically-measurable chance." (Bader Tr. 74:5-14.) Therefore, in his view a "substantially greater chance of survival" means *any* statistically measurable chance of survival. Dr. Bader quantifies this chance of survival by providing percentages based on "what transpired," the state of [Decedent's] disease at that time," and "his response to the treatments": Decedent had a 0% to 5% chance of survival when diagnosed in December 2017, but a 5% to 10% chance if he had been timely diagnosed in August 2017. (Bader Tr. 157:11-158:2; 117:19-119:8.) Dr. Bader's opinion thus in no way states that Decedent loss a *substantial* chance of survival as *substantial* is used in the case law. *Kimball v. Scors*, 59 A.D.2d 984, 985, 399 N.Y.S.2d 350 (1977) ("The ultimate finding cannot be whether the deceased would have a certain percentage chance of recovery; rather, it must be whether there was a substantial possibility the decedent would have recovered but for the malpractice.")

Moreover, a speculative "possibility" of a "some" chance of survival or responding to treatment is all that Dr. Bader identifies. Dr. Bader testified that there is a "*possibility* that he may have had *some* prolongation [of] survival" (Bader Tr. 117:4-18 (emphasis added)) and Decedent's HCC was "probably not" curable, with Decedent having a "slight chance" of five-year survival. (Bader Tr. 177:19-22). Plaintiff's expert's mere speculative statements regarding Decedent's

chance of survival cannot withstand summary judgment.  *Rotante v. New York Presbyterian Hosp.-New York Weill Cornell Med. Ctr.*, 175 A.D.3d 1142, 1143, 107 N.Y.S.3d 289 (2019) (citing *Park v. Kovachevich*, 116 AD3d 182, 191 (1st Dept 2014)) (affirming trial court granting summary judgment for defendant where "plaintiff's expert merely speculated" that timely discovery of the life-threatening condition would have given decedent a 30% chance of recovery). Dr. Bader's opinions are therefore insufficient to meet the standard under New York law for proximate cause.

Accordingly, even "in context," these small percentages and Dr. Bader's analysis cannot support a conclusion that Decedent faced a "substantial" loss of chance. (*See* Pl. Mem. at 9.) A mere statistical probability, and one as low as 5% to 10%, cannot constitute a "substantial" loss of chance. *Mortensen v. Mem'l Hosp.*, 105 A.D.2d 151, 158, 483 N.Y.S.2d 264 (1984) ("[P]roof of a possibility of cure does not satisfy a prerequisite to liability[.]"). As Defendant argues, and the Court agrees, *any* chance cannot constitute a *substantial* chance "as it would read substantial out of the substantial probability test." (*See* Def. Reply at 5.) Indeed, Dr. Bader repeatedly concedes how "small" Decedent's chances of survival would be even without the four-month delay in his diagnosis. (Bader Tr. 118:9-15 (stating "he lost a small but substantial chance" of responding positively to treatment); 142:5-9 (stating there was "substantial, albeit somewhat small, chance" Decedent responded positively to intervention".) That small chance, as Dr. Bader testifies, was less than 10%. A chance the Court finds is too low to prove proximate cause for a medical malpractice claim. *Candia v. Estepan*, 289 A.D.2d 38, 38–40, 734 N.Y.S.2d 37 (summary judgment appropriate where plaintiff could not show decedent had a substantial possibility of cure or prolongation of life).[4] Dr. Bader himself seemingly agrees, testifying "more likely than not, at

---

[4] Plaintiff challenges *Candia* as "readily distinguishable" because the disease at issue in that case, mesothelioma, "cannot be effectively treated by any known course of treatment." (Pls. Reply at 10 n.2 (citing *Candia*, 289 A.D.2d at 39-40).) However, the Court finds the reasoning of *Candia* applies here—

that point he was—he was going to succumb to his disease." (Bader Tr. 117:6-8.) Because Plaintiff fails to provide any evidence contradicting Decedent's low chance of surviving liver disease had he been diagnosed in August 2017, summary judgment is appropriate.

Finally, the Court disagrees with Plaintiff's characterization of Decedent's chance of survival falling from 10% to as low as 0% as a loss of his "entire chance" of survival. (Pl. Reply. at 10.) A chance falling from between 5% to 10% down to between 0% to 5% does not indicate a complete loss of chance. Rather, the delayed diagnosis reduced Decedent's chance by 5%. When diagnosed in August 2017, Decedent retained some chance of survival or responding to treatment; that chance remained slim, however, so slim that it could possibly be zero.

The Court therefore rules in favor of Defendant on this issue and concludes that MCH did not proximately cause Decedent to lose a substantial chance of survival.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment is DENIED and Defendant's cross-motion for partial summary judgment is GRANTED. The Parties are directed to appear for a telephonic pre-trial conference on April 18, 2024 at 2 p.m. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest. The Clerk of the Court is directed to terminate the motions at ECF Nos. 53 and 59.

SO ORDERED.

Dated: March 8, 2024
White Plains, New York

_____
Nelson S. Román, U.S.D.J.

---

while treatment was available for Decedent, for all intents and purposes, by the time of his visit to MCHC in August 2017 and certainly by his diagnosis in December 2017 Decedent had a very slim chance of survival, less than 10%.